UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| PEOPLE10 TECHNOLOGIES INC., | : | Case No. 20-cv-762 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| ALVEO HEALTH LLC, | : | |
| Defendant. | : | |

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS (Doc. 7)**

This civil action is before the Court upon Plaintiff's motion to dismiss Defendant's counterclaims (Doc. 7) and the parties' responsive memoranda. (Docs. 9 and 10).

## I. FACTS <u>AS ALLEGED</u> BY THE COUNTERCLAIMANT-NONMOVANT

For purposes of this motion to dismiss, the Court must: (1) view the counterclaim in the light most favorable to the counterclaimant; and (2) take all well-pleaded factual allegations as true. *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

Defendant-counterclaimant Alveo Health LLC ("Alveo") is a corporation that processes medical insurance claims. (Doc. 5, Counterclaim, at ¶ 2). Alveo engaged Plaintiff-movant People10 Technologies Inc. ("People10"), a software company, to develop a new "cloud-based claim submission software." (*Id.* at ¶ 3). In December 2016, the parties executed both a Statement of Work and a Development Services Agreement

wherein People10 would complete the project in 10 months at a cost of $400,000. (*Id.* at ¶ 7).

Between September 2017 and November 2017, People10 made a series of representations to Alveo. First, in September and October of 2017, People10 advised Alveo that People10 was "on the cusp" of completing the development project. (*Id.* at ¶ 9). In November 2017, People10 said it would take five months to complete the project under a new contract. (*Id.* at ¶ 12). Second, sometime between September 2017 and November 2017, after People10 moved to New York from India and reconstituted as a United States entity, People10 said its move necessitated a new agreement. (*Id.* ¶ 10). Third, in October 2017, People10's CEO, Rakesh Dahiya, "indicated" that People10 would stop its work on the project unless the parties executed a new agreement. (*Id.* at ¶ 11).

In December 2017, the parties executed a new Statement of Work and Development Services Agreement. (Doc. 1-4). The 2017 agreements "offered additional services or enhancements on top of the scope of the Development Project." (*Id.* at ¶ 7). Shortly after executing the 2017 agreements, Alveo discovered that People10 had misrepresented its progress on the project. An independent auditor hired by Alveo found "80% of the "back-end work had not been completed." (*Id.* at ¶ 17). Additionally, according to Alveo, People10 failed to provide deliverables; refused to turn over source code; and failed to devote the contractually-obligated resources and hours. (*Id.* at ¶¶ 18-

22).

In May 2018, Alveo's CEO, Joe Sunderman Jr., notified People10 by email to stop work on the project. (*Id.* at ¶ 24). Less than a month later, in June 2018, Sunderman, Jr. gave notice, also by email,[1] of the alleged breaches, specifically mentioning the failure of deliverables and the withholding of the source code. (*Id.* at ¶ 25). People10 took no action in response to this email. (*Id.*)

Alveo alleges that it paid $550,000.00 to People10 and "received nothing of value." (*Id.* at ¶ 28). Alveo also alleges that it "performed all material obligations" under the agreements. (*Id.* at ¶ 33).

In responding to Plaintiff People10's complaint, Alveo interposed an answer and raised counterclaims for breach of contract, conversion, fraud, and unjust enrichment. (Doc. 5). People10 now moves to dismiss those counterclaims.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint, or a counterclaim, and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint[2] contain a "short and plain statement of

---

[1] This communication was formatted as a letter and sent as an email. The parties use the terms email and letter variously.

[2] For present purposes, "complaint" should be read interchangeably with "counterclaim."

the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id*.

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id*. (citing Fed. R. Civ. P. 8(a)(2)).

4

## III. ANALYSIS

This is a diversity case. There is no dispute that Ohio law applies to the substantive law.

**A. Breach of contract**

Both parties have alleged breach of contract. The present motion tests the sufficiency of counterclaimant Alveo's breach of contract claim.

The parties agree on the elements of breach under Ohio law. They are: 1) existence of a contract; 2) performance by alleging party; 3) non-performance by the adverse party; and 4) damages. *Tidewater Fin. Co. v. Cowns*, 197 Ohio App.3d 548, (Ohio Ct. App. 2011). The second element, performance by the alleging party, is the source of the dispute here. Specifically, People10 alleges that Alveo failed to follow the agreements' notice-and-cure procedure before terminating. (Doc.7 at 11). For this reason, People10 concludes that Alveo has not "performed" and cannot maintain a breach of action claim. (*Id.*). Alveo argues that it did properly put People10 on notice of its failures and allowed for a cure before terminating.

People10's arguments fall into two broad categories: failure to provide "reasonable detail" and failure to provide for a 10-day cure period. The Court looks at each in turn.

People10 first alleges that Alveo was required, with respect to any problematic deliverable, to provide a notice "stating in **reasonable detail** the manner in which the

unacceptable deliverable failed to meet the Deliverable Acceptance Criteria." (Doc. 7 at 8) (emphasis added). People10 argues that neither the May 2018 nor the June 2018 email provide "reasonable detail." (*Id.*). In response, Alveo claims that the question as to whether the communications included reasonable detail is a "factual dispute." (Doc. 9 at 4).

There are two problems with People10's "reasonable detail" argument. The first is that the "reasonable detail" requirement is cabined to the "Provisions and Acceptance of Deliverables" section of the Development Services Agreement. It sits within a larger article, "Article 2 - Working Relationship." By its own terms, it determines how the parties will provide, test, complain of, and cure allegedy defective "deliverables." (Doc. 1-4, §2.2). If the established process fails to cure a deliverable, Alveo may indeed terminate—but, by terms of this provision, Alveo may terminate only the relevant statement of work ("SOW"). (Doc. 1-4, §2.2(d)(i), PageID# 49). Nothing in this section of the contract contemplates that a failed deliverable would give Alveo the option to terminate the larger Development Services Agreement. ("DSA"). (*Id.*).

Furthermore, the "reasonable detail" requirement only concerns termination for a lacking deliverable. (*Id.*) "Deliverables" are not People10's only obligation in the agreements and not the only contract obligation for which Alveo alleges a breach. Explicitly, the agreements are also for "services." (See e.g., "Statement of Work," Doc. 1-3) (discussing both "deliverables" and a host of other "activities"). Beyond services,

6

there are additional obligations on which a breach could be predicated. For example, both SOWs detail the "support team" People10 would commit to the project. And indeed, it is part of Alveo's counterclaim that People10 did not actually devote the resources promised in the SOW. (Doc. 1-3, PageID# 44).

Thus, while a notice of "reasonable detail" may be a prerequisite for the termination of a particular SOW based on a lacking deliverable, by the terms on the face of the contract, it is not a general condition precedent to terminating the larger DSA. In other words, material breaches may exist outside the procedure established in "Provision and Acceptance of Deliverables." (Doc. 1-4, §2.2). From the Court's perspective, a breach that does not concern the "provision of deliverables…" is properly considered under the general "TERMINATION OF BREACH section, discussed *infra*. (*Id.* at §11.3).

Second, insofar as Alveo's communications do constitute notices of defective deliverables, the Court agrees that the question of "reasonable detail" will depend on factual context. The June 2018 email states that the material beach is founded on: "1) the failure of People10 to provide services or deliverables (as defined in the contract documents) which are compliant or which were accepted by Alveo, and 2) the intentional and unjustified withholding of the code by People10." (*See* June 2018 Email, Doc. 7-1[3]).

---

[3] Alveo's counterclaim relies on this document. But it first appears in the record as an Exhibit to People10's motion. In opposition, Alveo makes no complaints about its authenticity or completeness. It is properly before the Court because the document is "referred to in the [c]omplaint [or counterclaim] and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

Initially, the Court finds this is "reasonably detailed" relative to the failure to provide the source code.

It is true the June 2018 letter lacks specific details on the deliverables. But the gist of Alveo's counterclaim seems to be that very little functional end-product was delivered whatsoever—not that it was merely deficient. If this were true, and the Court for now must assume it is, the Court is unwilling to say that a generally-worded communication about failure to provide "deliverables and services" is unreasonable under the circumstances. Assuming the truth of Alveo's allegations, there would be very little "detail" to give.

It is another question, though, whether Alveo's communications met the demands of the cure requirement established in the section that does generally govern how the DSA is to be terminated—"Termination for Breach." (Doc. 1-4). That section reads:

> "In the event of any material breach of this Agreement, the non-breaching party may terminate this Agreement by giving ten (10) days prior written notice to the other party. This Agreement will not, however, terminate if the other party has cured the breach before the expiration of such ten (10) day period." (*Id.*).

People10 argues that Alveo did not provide notice or a cure period before terminating the contract. (Doc. 7 at 8). In opposition, Alveo cites to its allegation that it has "demanded that People10 cure its breach of the Agreements and it has not done so." (Doc. 9-1).

Alveo alleges no other written notices outside of the May 2018 and June 2018 emails. The Court is content to rely on those communications as the only possible

"written notices" that would trigger a 10-day cure period pursuant to Section 11.3 of the DSA. The Court will analyze each in turn.

The May 2018 email states, in relevant part:

> "we no longer have a commitment from Alveo's Board of Directors to move forward with the Invigorate project. Our contract calls for time and material billing. Do not apply any time and material to our account after today, 5/18/2018. Do not further work or initiate any additional expense. You are free to reassign all of your resources today…." (Doc. 7, PageID# 99)[4].

Whatever the legal effect of this May 2018 email, it cannot be said to trigger a cure period. In fact, it would seem to foreclose any opportunity to cure because it asks that People10 do nothing further. The Court finds the May 2018 email was not a demand for a cure or an appropriate notice pursuant to Section 11.3 of the contract.

The counterclaim positions the June 2018 letter as the notice intended to trigger the cure period. (Doc. 5 at 9) ("People10 did not cure its breaches within ten days of Mr. Sunderman's June 10, 2018 letter. In fact, People10 took no action in response to this letter."). Alas, the Court cannot agree that this constitutes a proper notice or provides an opportunity to cure. The email describes itself as "written notice of termination." (Doc. 7-1). Another sentence asserts the unpaid invoice submitted by People10 "is rejected in its entirety since <u>the contracts were not terminated</u> for convenience." (*Id.*) (emphasis

---

[4] Here again, this email was referenced and relied on in Alveo's complaint but supplied by Peope10 in its motion. Again, Alveo does not contest its authenticity or completeness. Because Avleo relies on it, it is appropriate for this Court to consider it in this motion even though it is not attached to the counterclaim. *Bassett*, 528 F.3d at 430 (6th Cir. 2008).

added). The June 2018 email does not mention a cure period or state that Alveo will terminate the contract within 10 days. At the very least, the termination was effective as of the June 2018 email.

Such a factual finding should end the matter according to People10. This is because, according to People10's argument, when Alveo did not follow the contractual notice-and-cure requirement, Alveo failed to "perform." (Doc. 10 at 3). In turn, because performance of the alleging party is an element of the cause of action, Alveo cannot maintain its claim for breach of the contract. (*Id.*).

The logic contains some unproven assumptions. First, People10 assumes that a party could not have "performed" if that party circumvents a contractually-secured termination procedure. The Court notes that Alveo, assuming the truth of its allegations, has performed one of its key contractual obligations: it has paid $550,000.00 to People10. (Doc. 5 at ¶ 28). Alveo alleges, furthermore, it has "performed all material obligations…" (*Id.* at ¶ 33). The Court notes that Ohio recognizes the doctrine of substantial performance. *Hansel v. Creative Concrete & Masonry Constr. Co.*, 2002-Ohio-198, ¶ 12, 148 Ohio App. 3d 53, 56, 772 N.E.2d 138, 141. (Ohio Ct App, 10th Distr. 2002) ("For the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract."). Alveo does not use that term by name but its insistence that it paid $550,000 and "performed all material obligations" invokes the same principle.

Second, People10 seems to assume that a failure to follow contractual notice-and-cure procedure precludes a party's breach of action claim as a matter of law. In Michigan, that does seem to be the general rule. *See Convergent Grp. Corp. v. Cty. of Kent*, 266 F. Supp. 2d 647, 658 (W.D. Mich. 2003). ("…the County's failure to comply with the notice and cure requirements under the agreements precludes the County from maintaining its breach of contract claim.") But Michigan courts also recognize an exception for "incurable breaches." See *Patel v. Wyandotte Hosp. & Med. Ctr., Inc.*, No. 230189, 2003 WL 1985257 (Mich. Ct. App. Apr. 29, 2003); *see also Dix v. Atos IT Sols. & Servs., Inc.*, No. 1:18-CV-275, 2021 WL 1165762, at *8 (S.D. Ohio Mar. 25, 2021) (wherein a Ohio district court provides an in-depth discussion on Michigan's "incurable breach" framework.)

On the other hand, applying Georgia law, a district court in that state found, that when a party fails to meet contractual notice-and-cure requirements before terminating, that party

> "breaches the [a]greement with respect to the manner of its termination, but that party does not preclude itself from asserting other claims for breach pursuant to the [a]greement. Nor has it undercut its ability to raise its opponent's breaches as a defense. It simply has opened itself to liability…through an improper termination." *Flint Emergency Med., LLC v. Macon Cty. Med. Ctr., Inc.*, No. 5:12-CV-105 MTT, 2013 WL 5507279, at *8 (M.D. Ga. Oct. 2, 2013).

The Court does not presume that either of these positions represent the law of Ohio. The divergence in approaches does suggest the that the legal effect of an improper

11

termination is not as straightforward as People10 makes it out to be. People10's failure to cite specific authority for its assumption further underlines the point.

A principle that is established in Ohio law is that a "material breach entitles a plaintiff to stop performing." *Nious v. Griffin Constr., Inc.*, 2004-Ohio-4103, ¶ 16. (Ohio Ct. App. 10th Distr.) For that reason, even assuming Alveo's improper termination did equate to a failed "performance," that particular performance could seemingly be excused if People10's conduct constituted the first "material breach." *Id.*

Alveo does not raise arguments by name about substantial performance, incurable breach, or how Pepole10's potential material breach could have excused its own performance. People10 is not expected to refute arguments not raised. It does have to prove its entitlement to dismissal as a matter of law. To that end, People10 does not persuade this Court that when a party improperly terminates a contract, as a matter of Ohio law, that party has necessarily failed to render "performance" in all cases. Alveo is entitled to go forward with its breach claim because it may be able to show its performance under notice-and-cure was excused or that it "performed all material obligations."

The Court, therefore, denies People10's motion to dismiss with regards to Alveo's breach of contract claim.

**B. Conversion**

People10 alleges that Alveo has not pleaded a conversion claim relating to the

source code. The elements of conversion are: 1) claimant's right to possession; 2) conversion by wrongful act or disposition of plaintiff's property rights; and 3) damages. *Dream Makers v. Marshek*, 2002-Ohio-7069, 2002 WL 31839190, ¶ 19 (Ohio 2002).

People10 claims Alveo conversion claim does not "make it off the starting blocks" because entitlement to the source code at issue is contractual. (Doc. 7, PageID# 101). According to People10, when a tort, like conversion, is "factually intertwined" with a contract action, the claimant must "allege[] a breach of duty owed separately from obligations created by the contract." *Id*. citing *Acad. Imaging v. Soterion, Corp.* 352 F. App'x 59, 69 (6th Cir. 2009). People10 says that Alveo's own pleading demonstrates the rights to the source code are contractual and nothing more.

People10's argument here is not well-taken. As an initial matter, the Court agrees with Alveo that this inquiry is premature at the pleadings stage. In *Acad. Imaging*, which People10 relies on for its argument, the 6th Circuit reviewed a summary judgment decision on a factually developed record. 352 F.App'x at 68. With that record before it, the Court concluded that damages for the tort claim would mirror the damages for the contract action and thus dismissed the tort. *Id.* The present case is at the pleadings stage and, as Alveo notes, claimants may plead in the alternative. *See* Fed. R. Civ. P. 8(D)(2). Definitionally, pleading in the alternative must mean that a party can <u>plead</u> two causes of action even if <u>proving</u> one is fatal to the other.

Additionally, the intangible nature of the property at issue makes the Court

hesitant to declare that Alveo's conversion claim is wholly dependent on contractual rights. Alveo not only alleges that People10 has withheld the code but "prevented Alveo's access to the source code." (Doc. 5 at ¶38). The allegation allows for the possibility that Alveo <u>is in possession</u> of the code, in some form, but cannot access it in a useful capacity because People10 has obscured it. Were that true, Alveo may want to proceed with the theory that the code has been converted. In any event, without more factual development, the Court cannot conclude the conversion claim completely merges into the breach of contract claim.

For the reasons stated, People10's motion to dismiss Alveo's conversion counterclaim is denied.

**C. Fraud**

People10 alleges three shortcomings in Alveo's fraud argument: that it fails to plausibly plead the elements of fraud; that the pleading lacks the particularity required; and that the fraud claim is inseparable from the breach of contract claim. (Doc. 7 at 12-14).

In Ohio, the elements of fraud are a 1) representation; 2) which is false and made with knowledge of its falsity, 3) with the intent of misleading another into relying upon it; 4) justifiable reliance upon the representation; and 5) a resulting injury. *See McGrath v. Nationwide Mut. Ins. Co.*, 295 F. Supp. 3d 796 (S.D. Ohio 2018). "Allegations of fraudulent misrepresentation must be made with sufficient particularity and with a

sufficient factual basis to support an inference that they were knowingly made." *Coffee v. Foamex*, L.P., 2 F.3d 157, 162 (6th Cir. 1993).

The factual allegations relevant to the fraudulent misrepresentation claim are as follows:

- Under the 2016 agreements, in September or October 2017, People10 "advised Alveo that People10 was 'on the cusp' of completing the Development Project. (Doc. 5 at ¶ 9)." People10 admits to saying this and both parties admit that Alveo clarified "on the cusp" meant 5 months away. (*Id.* at ¶ 12).
- People10 claimed that moving its offices from New York to India and/or changing its entity's name necessitated a new contract. (*Id.* at ¶ 10).
- In October 2017, with the parties still bound only by the 2016 agreements, People10's CEO said People10 would not perform additional work on the project unless Alveo signed a new agreement. (*Id.* at ¶ 11).
- Finally, "[i]n November 2017, numerous People10's personnel, including its CEO, indicated that the original development project would be completed within five months of continued work under a new contract." (*Id.* at 12).
- The parties signed a 13-month contract with "additional work and enhancements to the original project." (*Id.* at 14).

With only these facts in support of the fraud claim, the Court agrees with People10 that the counterclaim does not plausibly allege fraudulent misrepresentation. The

problem, for Alveo, is that it has not pleaded facts supporting its justifiable reliance on People10's representations.

In determining whether reliance was justified, a court must "consider the nature of the transaction, the form and materiality of the representation, the relationship of the parties and their respective means and knowledge, as well as other circumstances." *Johnson v. Church of the Open Door*, 2008-Ohio-6054, ¶ 16, 179 Ohio App. 3d 532, 539, 902 N.E.2d 1002, 1007. Applying those factors here, the Court cannot conclude that Alveo's reliance, if it really did rely on People10's representations, was justified.

The "on the cusp" communication cannot reasonably support the allegation of fraudulent inducement because it is disconnected from the 2017 agreements executed by the parties. After the "on the cusp" statement, but before executing the 2017 agreements, both parties understood that "on the cusp" meant completion under the 2016 agreements was five months away. The 2017 agreements, though, do not reference the five months of work remaining. Instead, the 2017 agreements include "new enhancements" and come with a 13-month timeline. Alveo simply does not explain how a representation about the time-to-completion on an existing agreement, even if false, would lead it to execute a new contract with more services and a longer timeline. To the extent that Alveo did rely on these representations in signing the 2017 agreements, the reliance was unjustified.

The relationship and nature of the transaction between the parties provide no help for Alveo here. There is no apparent power imbalance between the parties. Alveo claims

fraudulent inducement but makes no indication it entered the 2017 agreements under duress. For that reason, it is unclear why Alveo could not have held People10 to the terms of the 2016 agreements. And clearly, Alveo had the resources to check People10's work when it so desired. It chose not to do so until after executing the 2017 agreements. The Court finds there is nothing about the transaction or the parties' relationship that lends support to Alveo's fraud claim.

As for the representation that People10's move required it to execute a new contract, the communication lacks "materiality." *Johnson*, 2008-Ohio-6054 at ¶ 20. Even if this were a knowing lie and Alveo relied on it, Alveo's reliance should not stretch any further than changing the legal entity name on the contract and re-executing it. Whether true or false, the assertion that a change in corporate form or location required a new contract is a technical detail and should not reasonably induce Alveo to sign a new contract with materially different terms.

Finally, with regards to the statement that People10 would stop working on the project unless new agreements were signed, Alveo believed the statement was true. (Doc. 9 at n.2). In other words, Alveo believes People10 would have stopped working if not for the new contracts. As Alveo admits, this means Alveo cannot rely on this statement as part of its fraud claim. *Id.*

Analyzing all the communications taken together, the Court still finds no way to bridge the gap, even using all reasonable inferences, between the alleged

misrepresentations complained of and the 2017 agreements executed. The problem with Alveo's argument is properly summarized by the long-established principle that "[a] person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different from what he intended, when he could have known the truth by merely looking when he signed." *McAdams v. McAdams*, 80 Ohio St. 232, 240–241, 88 N.E. 542, 544. (Ohio Sup. Ct. 1909).

Having found Alveo has not pleaded a cause of action for fraud because it has not alleged justifiable reliance, the Court will not address the parties' arguments about particularity under Rule 9 of the Federal Rules of Civil Procedure or the merger of the fraud claim with the breach of contract one.

**D. Unjust Enrichment**

People10 argues that, "under Ohio law, the equitable doctrine of unjust enrichment does not apply when a contract actually exists." (Doc. 7 at 19 (citing *Harwood v. BPJ Invs. Co.*, No. 91832, 2009 Ohio App. LEXIS 1919)). People10 argues that Alveo has admitted that a contract exists in its answer, so it cannot proceed on its unjust enrichment claim.

Although a plaintiff may plead claims for breach of contract and unjust enrichment in the alternative, a plaintiff may not recover on both claims." *McGrath v. Nationwide Mut. Ins. Co.*, 295 F. Supp. 3d 796, 813 (S.D. Ohio 2018). It is thus clear that, at the pleading stage, a claimant <u>can</u> <u>maintain</u> both causes of action.

Here again, People10's argument seems better suited for summary judgment than a motion to dismiss. And once again, the Court finds that accepting People10's argument would essentially mean that Alveo could not plead in the alternative at all. If Alveo must dispute the contract to plead unjust enrichment, in other words, it simply could not plead both causes of action. *See Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide*, Inc., 852 F.Supp.2d 925, 939-40 (S.D. Ohio 2012). The law is clear that a party may plead in the alternative, "regardless of consistency." *Id.*

Moreover, even if the parties agree there is a contract, the scope of that contract remains an open question, properly developed in discovery. *See Cunningham Prop. Mgmt. Tr. v. Ascent Res. - Utica*, LLC, 351 F. Supp. 3d 1056, 1066 (S.D. Ohio 2018). Questions discussed *supra*, like the first material breach and what contractual obligations are considered material, may come to bear on whether the contract was valid and, if valid, for how long each party was under its obligations. For these reasons, the Court denies People10's motion to dismiss with regards to Alveo's counterclaim for unjust enrichment.

## IV. CONCLUSION

Accordingly, for the reasons reflected above, the Court **ORDERS** that:

1) Plaintiff-People10's motion to dismiss (Doc. 7) Defendant-Alveo's counterclaim is **GRANTED** in part and **DENIED** in part as follows:

a. Plaintiff's motion to dismiss (Doc. 7) is **GRANTED** as to Count III of the counterclaim and that claim is **DISMISSED**;

b. Plaintiff's motion to dismiss Counts I, II, and IV of the counterclaim is **DENIED**, and those claims shall proceed.

**IT IS SO ORDERED.**

Date:  9/21/2021  *s/Timothy S. Black*
Timothy S. Black
United States District Judge